Alright. We'll now hear argument in the last two cases on the calendar, which we've ordered consolidated for argument purposes. Nancy Walther Graf v. ZYNGA Game Network, Inc. No. 11-18044 and Mike Robertson v. Facebook, Inc. No. 12-15619. Good morning, Your Honor. I'm Adam Levin, representing the appellant in this case, Ms. Graf. Because of the consolidation, I wanted to advise the court. I'm going to be taking seven minutes at first and holding back. Okay. I'll try and help you. Thank you very much. I appreciate it. Also, as Your Honor can see very quickly, if you haven't seen already, I occasionally stutter when I speak. It's not a problem for me. It shouldn't be for you all. If anything I say isn't entirely clear, please let me know. I'll go right back over it. I suspect that problem will flow not from your stuttering, but from our lack of understanding. So we'll let you know if we're not following your argument. In either case. I'll tell you. Go ahead. I think it's fair to say, as recently as in the newspaper this morning, that the sanctity of electronic communications is a very important issue these days with the NSA and what have you. This case is a perfect example of where there are rules protecting people's electronic communications. That is, the ECPA. And a company, Zynga, that violated those rules, as well as its own internal policies and promises to its users, and intercepted and divulged the appellant's electronic communications and sent them to third parties for its own benefit. Could I? I promise you I really worked hard on this case and struggled with it. And so I'm trying to make sure I understand exactly what the communication was. It's the Facebook user, when it clicks on Zynga to open an in-frame window, the referral header, meaning the Facebook ID number plus the page, the URL of the page that user was sent on, is delivered to Zynga. But that's not the communication you're talking about, right? You're talking about Zynga's taking that communication and giving it to a third-party advertiser. Am I correct, or clarify to me what's wrong with that? Let me correct. To be as colloquial as possible. Don't be colloquial. Just be specific. I am specific. But it's easier when you strip away all of the computer talk for a minute and get down to real people talking. The user in Facebook says to Facebook, the communication is as follows. From the user to Facebook, Ms. Graf to Facebook, Facebook. Now, that's not right, right? Right. Because does the user send an e-mail to Facebook saying, Mr. Facebook, please do something for me? That's not what happens, right? Click to play when you, what the user is doing is asking Facebook. I've logged into my Facebook. Don't characterize it. Just tell me what happened. I log into my Facebook account. Is there a, and I don't send an e-mail to Facebook. I click on a link to Zynga. Is that correct? You click on a link in Facebook. And does it say Zynga? Well, what does the link say? What does the link say? The link contains the page that you are, who you are. Well, what do I see? What do I see in Facebook when I click? What am I clicking on? You're clicking on the request to play. What does it say? What does it say? So I move my cursor to something. I mean, I actually am not in Facebook, so I actually don't know. I move my cursor to something. And what is that? And I click. And what is that something? To play a game. And what does it say?  I don't think you're answering my question. Why not? I'm trying to answer your question, Your Honor. There's an icon. There's an icon. It's a Zynga icon? And what it does. Okay. And then it asks Facebook to open an iFrame and play a Zynga game. So when I click on the Zynga icon, then a frame opens up on my Facebook page? Yes, and you're playing within the Facebook application. Okay. And so at that moment, when I have clicked on the Zynga icon, a referral header goes to Zynga? Is that correct? Or a referral header goes to Facebook, but why would they want a referral header? The communication is between the user and Facebook. The request is to Facebook to open the frame and launch. Well, why is that? I mean, you're characterizing it, and I'm just trying to figure out why. So I click on the Zynga, and then is it automatically a referral header goes to Zynga, or automatically a referral header goes to Facebook? The referral header goes to Facebook. Okay, so automatically a referral header with my Facebook ID and the URL of the page that I'm currently on in Facebook goes to Facebook because I'm in the Facebook? Universe. Universe. Yes. Okay, and then Facebook has a mechanism to send that referral ID to Zynga? It advises Zynga that a Facebook user wants a Zynga game to open within Facebook. Facebook specifically says it will not send that communication to Zynga containing the user's personal information, and Zynga specifically says also it will not take it. How does Zynga know how to open up a frame on my user page if they don't have the information about who I am? And if I'm playing the game, don't they store my information about what characters I have and little items and things? Whatever further communication happens after that, that may happen between the user and Zynga when they're in the Zynga universe, has nothing to do with the communication in question here, which is the communication between the user and Facebook to launch an app. That app happens to be a Zynga game. And the problem here, Your Honor, is that that communication, again, Facebook said they wouldn't take it. Zynga said, first of all, they're barred by the ECPA from taking it, but even more than that, in their privacy policy, their own internal policy, they said we don't take any PII, we don't send it to any third parties. But, Mr. Levitt, I don't understand from a practical standpoint. I want to play my Zynga game. I want to launch Farmville. And I have stored information about that game on Zynga's network. And in sending this message through Facebook, I fully expect Zynga to do something, to open my Farmville game. So why is it a misrepresentation to the Facebook user who is affirmatively requesting that my individualized game be opened from the Zynga site on my Facebook page? How does that violate the law? Because we're talking about two separate communications. The fact that the Facebook user is then playing a game within Zynga. But the user doesn't care. The user wants Zynga to launch its game. The fact that it goes through a third party messenger, if you will, and I use that term advisedly, through Facebook in order to then retransmit my request to Zynga so that Zynga can then send the data to Facebook, which then sends it to my Facebook page. What's the beef here? I just don't understand how that can violate the law. It sounds like what your Honor is saying, though. Number one is that it's no harm, no foul, is what you're saying almost. I don't know. You're being misled. I'm the Facebook user, and I have asked Facebook to give me my Zynga game. And Zynga is responding to the request that I initiated and giving me my FarmVille game. You asked Facebook to reach out to a third party and open an application. And the fact is there was a promise by Facebook and a promise by Zynga not to take or disclose that communication. To the extent that the user and Zynga then communicate with each other, that's a separate communication, Your Honor. But how am I misled? I mean, I'm the one who's affirmatively requesting the service. You're misled. Where's the misrepresentation? The misrepresentation is that it's a violation of the statute to take that communication in transit. And the second thing is that even more than that, and this is the concept. How are they taking it in transit? I mean, I have a whole other question about whether that's a content or just a record. But if my communication goes to Facebook and Facebook sends it to Zynga, then they're not intercepting any communication. That would have to be if they intercepted communication between me and Facebook. Two things, Your Honor. Number one, I'm short on time and I don't want to cut into it. I will answer this question to make sure that I don't want to change. We'll give you a little bit. Okay, thank you. The answer to that is that communication was promised to the user, the one that was sent with the Facebook user ID, not to be sent to Zynga. Zynga got that communication because of the way that it programs its software. It wrongfully reached out and it took that communication. That's the problem, Your Honor. I thought you said Facebook sends it to them. Facebook sends a request. It does not send that referral header. Facebook promises it won't send that referral header. It simply sends a request to launch the game in the iframe. Once the iframe is launched, what happens in the iframe is between the user and Zynga. But that's not the communication I issued here. Okay. Thank you. Well, let's hear from your colleague. Good morning. May it please the Court. Katherine Seery for Appellant Mike Robertson. I would like to address our Stored Communications Act claim. It's different and much simpler than the companion Zynga case. But before that, with the Court's permission, I would like to briefly address our breach of contract claim. Here, the privacy policy, the consideration that Facebook supplied for this contract, was in part, and in the material part, a promise not to disclose user identities to advertisers. When it did that, it took its consideration back and deprived Appellant Robertson of the benefit of the bargain of that contract. That constitutes actual and appreciable harm. It's not de minimis. It's not conjectural. The question of whether there is a monetary remedy is a separate question altogether. Well, the harm goes to the standing issue. The Court, as I understand it, said that there is no showing of material damages and that the fact that your personal, I guess the Facebook identification number and URL header was sent to somebody else wasn't damages. So it's a matter of law that you haven't shown any material damages. So what was wrong with that? I mean, maybe you have enough harm to get past the standing. Under California law, Your Honor, we have more than that because the sole case that binds this Court on the issue that was cited is Aguilera v. Pirelli Tire Corporation, which uses this phrase, actual and appreciable harm, but not in the context of damages. There, that case decided that the fear of a future layoff did not constitute a breach. So the real holding in this line of cases that goes back to just Aguilera in this district, in this circuit, was actually a holding that there was no breach. And, in fact, the Ninth Circuit, in no published opinion, has ever disapproved of the availability under California law of disgorgement and nominal damages, as in Sweet v. Johnson. And California Civil Code 3360 states that if there is a breach of a contractual duty without appreciable detriment, plaintiff may still proceed for nominal damages. And, in fact, in Foster Poultry Farms, which we submitted to this Court, an unpublished decision by this Court, the Court held that not only there was a breach of a contract and there was intangible harm, no evidence of damages, the Court there held that not only are nominal damages available, but so is disgorgement of the unjustly obtained profits by the breachor. So any statement of law, the Ninth Circuit has never said that nominal damages are not available in California. They clearly are. There's even a jury instruction to that effect. So we believe that the Court erred when it dismissed our contract claim. And unless there are any further questions on that, I'll move to the Stored Communications Act claim. Well, I'll ask my question, but it may lead you into what you just said. Assuming there is a breach of contract, was that a violation of the statutes? Your Honor, so it's slightly different because the statute requires consent. And we believe, and I think they're supporting case law, that if a contract states that there won't be disclosure to advertisers or there's no other basis for inferring consent, then by default the statute prohibits, and this is the Stored Communications Act, prohibits disclosure. I thought the consent was just an exception. In other words, you still have to show that there was a violation of the statute and then there's an exception to that in A, I guess it's 2702A, and then there's an exception to that in 2702B saying, but it's not a violation if it was to an intended recipient or there was consent. That's correct. So we still need to look at whether there was a violation. So here's the violation in our case, and it does differ from the Zynga case. The statute, 2702A2B, actually doesn't say what Facebook says it says. The communication that's protected does not have to consist of data that you're sending to the provider to be stored. That's too narrow of a reading. What the statute actually says is that the communication has to be solely for the purpose of providing storage services, and what that means is that when I communicate to my service provider, Facebook, and I say, there's some stored content. I'd like you to retrieve it and display that for me. That communication is made to Facebook solely for the purpose of providing storage services, and that brings it within the ambit of the statute, and it's protected unless there's an exception. Could you address whether the Facebook ID number and URL locator for that page constitute contents of a communication, as opposed to just record information as suggested in 2703? Yes, Your Honor. If they were disaggregated, certainly the user ID would be a record, and that's clear. But the records statute, the exception, should be narrowly construed, because Congress chose to exempt from the definition of a record anything that is the contents of a communication. So just because a user ID happens to be within or a part of what would otherwise be a communication doesn't mean that the entire communication is now a record. But what do we do with all of our laws with regard to trap and traces and so on, where we have personal identification numbers that are associated with cell phones, with all kinds of media that doesn't necessarily say anything about what was being said, but it does establish that a communication occurred at such and such a time with such and such a receiving party, and it lasted for whatever the duration was? Yes, Your Honor. Those are Fourth Amendment cases, so they're not directly on point. Well, they are with regard to what constitute contents, because if you're simultaneously intercepting contents in the criminal arena, now we have very different requirements for what is required in order to intercept those communications. Two things, Your Honor. To the extent the closest thing to precedent that's binding on this Court is the Forrester case. And in Forrester, published Ninth Circuit opinion, this Court stated in dicta that if you're going to use a URL, there are two things that make a communication here. First, I intend to communicate my request to Facebook to display a certain picture and stored content. So that is the very intent of that. That is a communication. The analogy would be if it's a pen register, what I'm intending to do is have a conversation and speak words to somebody, so the envelope or the telephone number is not what I intended to communicate. It's different here, because I intended to tell Facebook what to do, what to store or retrieve. The other one. But, I mean, let's take it into the word processing realm. I mean, what about all the metadata that is generated when I draft the opinion in this case? And I'm not saying it's going to be me, but whoever drafts the opinion. You know, that says a lot about who wrote it and when it was created and, you know, when it was transmitted. But it doesn't say anything about what the opinion says. That's right, Robert. But in this case, the URL said exactly what I asked Facebook. My communication with Facebook revealed exactly. I thought it was just that the URL is the location of the page the user was on at the time it clicked. And that just seems much more analogous to an address, which we've said is a record and not the content. It isn't the ‑‑ I forgot what they use. It's like the substance, the import. I mean, there's a definition of content, which doesn't seem to include this is the page I was on when I clicked. It does if what that reveals is what I was interested in viewing, and that's what Forrester recognizes. If I say to Facebook, hey, I'd like to look at these ‑‑ at any particular content, and that particular request, including the exact content I wanted to look at, is disclosed, then that's a violation of 270282, because ‑‑ If it's content. Because it is content, because that's ‑‑ Well, I dial. I think one court says you dial 1‑800 mattresses, and then it's possible to discern your interest in buying a mattress. So, I mean, it isn't as if the record information doesn't disclose anything, so that can't be the requirement. And here, all you have is the address of the page you were on. It's not ‑‑ we also said in Forrester, you put in a search term in Google, and then that is some content. But this is just of the page I was on, my address. Well, Forrester says both. It has two examples. The other example is if it's a New York Times URL that points to the specific article, then that reveals too much, arguably. And the other difference here is that this is exactly the communication that the user intended to communicate. So communication is broadly construed. First, a click of a link, that's the only way that users can communicate with Facebook. They click on links. But those clicks have substance, import, purport, and meaning. Show me this stored content. But they do the same thing if we're looking at long‑distance telephone calls or cell phone calls. I mean, I just ‑‑ drawing the line where you want us to draw it seems to me to be too broad as opposed to too narrow. Your Honor, I don't know that there's much more I can say on this. And I would like to reserve a little bit of time for rebuttal. I will give you some time for rebuttal. But let's hear from the defendants and see if they can help us on some of these issues. Thank you, Judge Paulin. And please, the Court. My name is Aaron Panner. I represent Facebook in this matter. And I'll be addressing the federal statutory claims as it applies to allegations against Facebook, as well as the common law claims. Because Mr. Nasiri started there, I'll start with the breach of contract and other state law claims, which are both statutory and common law, and just say that the phrase from Pirelli is actual and appreciable damage. And as a number of cases have held under California law, that Meyer v. Sprint Specter may be the best California case for the idea that generally that means pecuniary harm. And in this case, there's been no allegation of such harm. And that's why the district court below and other courts faced with similar facts have said that a mere disclosure of personal identifying information in the absence of some sort of consequential harm is not sufficient to. But the problem I'm having, we've got a number of district court cases that are citing to one another, because nobody seems to be able to cite to any substantive law that supports it. The problem I'm having with your argument is there has to be substantial value here in the information that is being shared with advertisers, or else Facebook and Zynga and everybody else who collects and shares this information wouldn't be doing what they're doing. And we're here on basically a pleadings appeal, so we don't have any discovery to help inform us as to how valuable is this information, and in what form does it have to be compiled. It seems to me that what's really important to your client is the ability to identify a particular Facebook account and compile a record of all the places that it goes. And then we try to narrow the focus so that we reach a targeted group of advertisers who are looking for just this kind of profile. And all of that begins with this URL and Facebook identifier. But, Your Honor, the question here is whether as a result of the breach, the plaintiff suffered actual and preachable damage. And so the issue then is there is no allegation that this was of benefit to anybody. There's no allegation that anyone actually looked at it. There's no allegation that any advertiser was aware of the alleged circumstance that was the basis of the complaint in this case. But is there any California case, and this is my concern, is there any California case that says as a matter of law, merely disclosing someone's personally identifying information is not, doesn't constitute damage, or you're not entitled to nominal damages? The Fogelstrom case is admittedly under a different statute. That wasn't breach of contract. That's right, Your Honor. But the fact of the matter is... Should we consider certifying this question to the California Supreme Court and let them tell us whether... I don't think so, Your Honor, because I think there is clear guidance from the Meyer v. Sprint Spectrum case that says that generally, when we're speaking of actual and appreciable damages, we mean pecuniary damages. There is the Fogelstrom case, which provides guidance with respect to the disclosure of personally identifying information on behalf of the plaintiff. That's under a statutory scheme, but with a very similar requirement for the damages element. And in addition, it would generally be inappropriate for the federal court to expand. Now, of course, certification wouldn't normally do that. Well, we're saying failure to state a claim. I mean, we would be affirming failure to state a claim. Correct. And so we'd have to say, as a matter of law, your allegation of personally identifying information being released can never be damages. And I guess I'm troubled by saying that in the absence of any California law. It could not be damages on the allegations here, because there is no allegation that that was worth anything to anyone who received it, or indeed to the plaintiff. And what I think is critical here, and this has been pointed out by, for example, by Judge Koh in the Lowe case, which has been cited, is that there's no allegation that as a result of this disclosure that the plaintiff was deprived of any opportunity to make use of his personally identifying information, the personal information that was supposedly disclosed, at all. He's in no way worse off as a result of this disclosure. Now, there are allegations that may give rise to claims of consequential harms. He doesn't have those. There may be circumstances where perhaps one could imagine where there's been a specific value assigned to some sort of preserving some type of fact as confidential. Nothing like that here. So we really have here, again, if you get back to sort of the factual allegations of what was disclosed, all that was supposedly disclosed was a URL, a Web page address that had a user ID in it, from which, allegedly, advertisers could decode and infer the identity of the user and the location on the Internet. Could you respond to opposing counsel's argument that at least the URL location is a content of the communication? Yes, I don't think it is a content of the communication, largely for the reasons that Judge Tallman, I think, was suggesting in his questioning of counsel, which is that the address on the Internet is very much like the dialed phone number in a circumstance. Now, there may be much information to be gleaned, which is obviously why the government likes to get that information in certain circumstances. There must be maybe a great deal of information to be gleaned simply from knowing where an individual, what information an individual is choosing to see or what, you know, what person an individual is choosing to call. But that doesn't make it contents. The statutory definition is specific that what Congress had in mind was actual content of a communication between people, where there is purport or meaning or substance conveyed. Well, part of the problem is that we're dealing with statutes that were written long before this technology existed. And, you know, Congress was enacting in the context of sort of traditional wiretap investigations and maybe back in the 80s the beginnings of e-mail. But, I mean, I don't think Congress in its wildest dreams thought about what your clients are doing now when it enacted that legislation. Well, I think that's right. And I think, actually, Your Honor, that's why there are really three reasons why the claim, the statutory claim against Facebook here fails. And they are sort of, they are really somewhat related. And I think that the first one is, goes to the question whether the alleged communication here was provided for the purpose of providing processing or storage services. What Congress had in mind, and I should say when Mr. Nasiri read that language, it's to the subscriber or customer. It has to be storage services to the person sending the communication. So to the extent here somebody is looking at content stored on the, on a third-party Facebook site, there's no argument that that communication is for the purpose of providing storage or processing services to the customer or subscriber, to the person sending or clicking on the link. I think that's very important. But if you think about the structure. I'm not sure I understood that. So the Facebook user is creating their whatever, their compendium of information about themselves, and that's stored on a remote server, the Facebook server. Yes. Your Honor, so there's two different situations that one could think about. And so in a circumstance where someone is looking at their own content, that's one circumstance. And I can get to that. I think even in that circumstance, the better reading of the statute is that what Congress had in mind when it was talking about storage services was the actual data that was provided to be stored or processed. Because any other reading runs into problems. I mean, aren't we talking about what used to be called computer time sharing, where, I mean, nobody could afford a $3 million IBM mainframe computer that filled a whole room, so you leased space on somebody's storage site in Cupertino, and you processed your payroll off of whatever data was stored there. How is that different, though, from Facebook and Zynga maintaining individual storage locations for the data, which make up the Facebook page or the FarmVille game? And isn't the user requesting access to that remotely stored data when it launches a request to access that account? I'm not — I actually don't dispute any of that, Judge Tolman. That is to say that Facebook doesn't dispute that, to the extent that Subscribe, for purposes of this case, there's no dispute that when subscribers take data and upload it to their Facebook pages, that that may be a storage service within the meaning of the statute. But what the question here is, if the subscriber — so let me take two different examples, if I could. Just backtrack for a second. So let's first take the example, because I think it's easier, where the customer said — the Facebook subscriber. So if I'm on Facebook, and I may go to look at the page of a group that I'm a member of. So let's say I'm a member of a knitting group, and I go to the knitting group page, and I look at the content that's stored on the knitting group page. There's no argument that my request to look at the knitting group page is for purposes of providing storage service to me. It can be stored for somebody else. But the statute just says, if you're a remote computing service, which Facebook is. You've just conceded that, and I don't see how you could not. Then, remote computing service, you have certain obligations under the statute. And so the only question is, did Facebook violate those obligations under the statute, not whether you're storing the knitting page for me? But, Your Honor, the restriction under the statute is written in terms of defined types of communications that may not be divulged. And the communication that may not be divulged under 2702A2, it has to be a communication which is carried or maintained on that service. It has to be on behalf of or received by means of electronic communication from a subscriber or customer of such service. Or created by means of computer processing. I allotted that because it's not an issue in our. Well, you know, the Facebook user ID, at least, is generated from the interchange between, instead on behalf of the user to identify them so they can find their page again, right? I'm not sure I would say that that's a function of data processing within what Congress would have had in mind. Well, I provide you with all my data. I mean, even if it was stored computer time, right, I provide you with my data. And then you, then the computer service will have to create some title for that so they can find it again. And why doesn't that qualify under as information that, you know, whether it's contents of a communication is another question. But it's certainly information that the server has created for me. Well, because, as Your Honor just correctly pointed out, it's not a communication from the subscriber to Facebook. But wasn't it created by means of computer processing of communication? It processed my communications and created an ID number for me? I'm not sure, Your Honor. I would argue, again, it wasn't strictly at issue, so I haven't given a lot of thought to that. But I think that what I would say is that given what Congress would have had in mind, which I think is precisely what Judge Tallman suggested, which is I have a lot of data that I don't have the computer capacity to process, that what Congress had in mind was data that I provide that will be processed according to a particular set of algorithms that I understand and sent back to me, that creation of a user ID as part of providing this overall social networking service would not qualify under this. But the critical point that I wanted to get to was it's solely for the purposes of providing storage, and this is still referring to the communication at issue, solely for the purposes of providing storage or computer processing services to such subscriber or customer. And the reason that that's important is that the storage services at issue here that are being referred to are the storage, Mr. Nasiri referred to the storage of someone's photographs and other information on their Facebook page. Okay? Now, what I started with, maybe I should have started there, but what I started with was a situation where I'm on Facebook and I'm not looking at my own page, I'm looking at a page of a third-party group or some other page of business. In that circumstance, the storage service that is allegedly being provided for the material on that third-party website is not storage service being provided to me, because I'm not the customer or subscriber who sets up that third party. But then Facebook creates the user ID number for you so that you can find your page again, and that's the information that's being sent off to the advertiser. I mean, I don't see how that doesn't meet the statutory requirement. So I do think that the factual allegations and the difficulty is getting in the way a little bit, and it's my fault. And I'd like to try to back up just for a second to try to clarify what the allegation is. Before you do that, are you eating up all of Mr. Siebold's time? I fear that I am, but I fear that I am. And I do want to give him some time, so go ahead and answer the question if you can, make your point. I will. Let me try to answer you more directly so that I avoid eating up too much time. And I do apologize that the factual allegations are sufficiently complicated that it's complicated. But let me just say that, because I don't want to sit down without saying it, that the user ID, to the extent that it is communicated to a third party website, that is a record. It is not contents. And it would be a very clean way for this Court to resolve this case to say, let's assume everything else. A web page address and a user ID are not contents of a communication name or a record, and therefore there's no claim under the federal statute. Okay. Good point to end on. Now, Mr. Siebold, I'm going to give you a little extra time since I'm going to give the other side some extra time. I'm going to let Linda Feddick for ten minutes. Thank you, Your Honor. If it pleases the Court, Richard Siebold on behalf of Defendant Appley Zinke. One of the first things I want to make sure the Court is aware, there are differences between the cases. In the Zinke case, the common law claims and the state statutory claims are undisputedly not at issue. So the issue about certifying it to the California Supreme Court doesn't even rise in the Zinke case because, again, those claims are not at issue. The plaintiffs in our case waived those claims because they acknowledged they couldn't show actual or appreciable harm. And, frankly, I think they also recognized that if they ever tried, it would arise from circumstances that were so individualized they could never get a class certified. And as a result, they focused solely on the federal statutes, the Wiretap Act, in an effort to get statutory penalties for a class which, by their allegations, attends to hundreds of millions of users. And all of this arises from the customary operation of the Internet and of browsers. The problem has been fixed. The Facebook plaintiffs allege this isn't happening anymore. Frankly, it was entirely inadvertent. So what was the fix? Did they just make it a numerical identifier that couldn't be tracked back? I think somehow it could have been fixed in many different ways. One, browsers now have been changed so that you can set it so that the referrer header doesn't move forward. I think there's also ways of encrypting. Frankly, I don't know the technical details of how that was done. But, of course, on the Internet, quite often, it's very important to know where someone came from. If you're on Google and you hit a Google search, sponsored search result, and go to Volvo.com, Volvo owes Google money. It's important that both Volvo and Google know where the user came from. So that's the way the Internet has functioned. Browsers now allow that not to happen. In any event, this has been changed. The other thing that's important, I think, is that this privacy claim arises because the users have placed information on their Facebook page, which is accessible in a Google search. Now, there are privacy settings on Facebook. And if somebody puts it behind privacy settings, nobody is going to get that. But their claim is that advertisers are going to be able to get to that part of a Facebook profile page that's publicly accessible. I don't think Facebook would like it. In fact, I think I've read an article that some companies have come to scraping data off of Facebook. Frankly, all of this is public information. And as Judge Tallman has suggested, I mean, these statutes are old. The last time we met it was in 1986. It was at the infancy of the Internet, you know, decades before Facebook, let alone Zynga, ever developed a method to do the kinds of things that we now do. And of course, this is obvious from the briefs, there are a lot of different technical statutory issues, in our case in particular, because there are no common law claims. The question is not whether there's a breach of contract, because that's gone from our case. The question is whether they're able to kind of force-fit these claims to fit these statutes. And we believe that there are three alternative independent reasons why this court can affirm a trial court. One, Zynga was an intended recipient. Two, Zynga was an intended recipient. Let's start with what is the communication at issue? Your Honor, your first questions to Mr. Leva hit exactly the point. As you know, Judge Ware, in his first dismissal order, relied on the intended recipient exception. When they amended, in our case, the corrected second amended complaint, our plaintiffs tried to avoid the intended recipient exception. So they said things like, it was a communication to at least Facebook. They skirted Rule 11. There is no question, at least as I think your Honor's questions to Mr. Levitt suggested, when you click a link on the Internet, that initiates a signal that transmits information to the operator of the website that you're going to. And in this instance, when you're on Facebook and you click a link, that's a message to Zynga's servers to load Zynga games into the iframe on Facebook. Frankly, I think the iframe is kind of irrelevant. It wouldn't make any difference whether when you click the Zynga link, you went to Zynga.com, or whether you went to servers and Zynga served up within the iframe the Zynga game and you were still on Facebook. The real point is the communication, and I'll get to contents. I think there's no contents to this communication. But the communication is a communication to Zynga to load the game within Facebook. And in support of our intended recipient argument, again, the basis of Judge Ware's decision, if you look at the complaint, although they've abandoned their breach of contract claim, within the corrected Second Amendment complaint, which for these purposes is deemed true, they specifically allege in paragraph 149, plaintiffs and the other class and subclass members transmitted personally identifiable information to Zynga. There is no way around the fact that the very thing that they're complaining about was, as Your Honor's question suggested, initiated by a click where the users intended to transmit that information, to transmit to Zynga the request to launch the Zynga game. Could the Zynga game open in an iframe on the page that the person is currently at without sending the referral information to it? You said there was a fix. I think there may be a way to, in the browser, encrypt or otherwise change the referral information. But it is not possible for a user to have Zynga servers load Zynga games onto a Facebook page without somehow transmitting something to Zynga so that Zynga knows that it needs to load the Zynga game. They have to know who you are because it's your game and they have to know where to open it. That's right. Zynga needs to know that it's your farm. There's no dead letter box on the Internet. That's certainly true in this setting. That may be overbroad. I'm not sure I'm capable of answering that question in its entirety. If there's no return address, how does Zynga know where to send the game? Well, that's right. And I think Judge Akuta's questions right out of the box to Mr. Leavitt hit on that. Frankly, those allegations are kind of crazy that you communicate to Facebook when you want to load a Zynga game. Clearly, you need to click a link that's a Zynga link. And that Zynga link, when clicked, loads a Zynga game. And the only way that that happens is for Zynga servers to load the game onto your Facebook page. And for us, again, particularly because of the very express allegations in their now-abandoned breach of contract claim, it is very clear that they acknowledge that the referrer header was intended to be sent to Zynga. And, you know, in the breach of contract claim, again, abandoned, they had said, oh, we gave this information to Zynga, and then Zynga breached the contract by giving it to others. Well, if you gave it to Zynga, that's what you complain about. You gave it to Zynga, and you fall right within the intended recipient exception, which is what Judge Ware found. The second independent basis on which the court can affirm the trial court judgment is these statutes, the Wiretap Act and the Short Communications Act, only apply to electronic communication services, ECSs, and remote computing services, RCSs. And Zynga, for these purposes, is neither. The plaintiffs mentioned, and it's true, within the Zynga game, you can communicate between users. And in that respect, Zynga would be functioning as an ECS, similar to an e-mail service. But that's not the nature of these claims and the case law. And I think Judge Code did a particularly good job of explaining that the analysis to whether somebody is an ECS or an RCS is context-specific, and it can't change. And in this instance, what they're focusing on is a click, when they're on the Facebook page, of a Zynga icon that requests that Zynga load the game onto Facebook. That has nothing to do with the Zynga message center, and as a result, in this context, Zynga was not acting as an RCS, as an ECS. Zynga was also not acting as an RCS because the statute, as Mr. Panner said, requires that the communication be solely for the purpose of storage or processing. Zynga, in this instance, does neither. It doesn't process the referrer header, it's not storing it, and it's certainly not solely for that. Zynga's role is to provide games that people play. If it's not storing it, how does it get to the advertisers? Because the allegation is that Zynga was selling the referral header information to advertisers, so it must have been doing something with it. Well, the allegations are, and the allegations are confusing and murky because they're just trying to get past the motion to dismiss, the allegations are it goes to Zynga, so you fall right within the intended recipient exception. And then the Facebook user ID allows Zynga to load the game, but under the statute, an entity is an RCS only if the sole purpose of the communication is to store the game. The second allegation was for data processing, a situation that Judge Tallman referred to back years ago when I was in college. You'd go to an IBM 360, you'd drop off your data cards, you could also at some point do it remotely. They would be processed and you would get it back. Things then changed. Microsoft Excel came out, as this Court said, in the Quan case, and all of a sudden a lot of processing could then be done on your computer. Frankly, I think the pendulum has now swung back and now there's a lot of cloud computing. But the point here is Zynga isn't an RCS because its role wasn't to process data. Its role was to provide a game. What's the last point? The last communication to the Court by Mr. Leavitt was last Sunday, this January 12th Rule 28J letter. We had had supplemental letters on contents. He said the contents about which he's complaining are two things. One, that the Facebook user ID. All courts have held that identification numbers like a Facebook user ID is not contents. Whether you look at pen register cases or the outside of an old mail envelope, it's quite work. Use analogies. George Tallman used metadata. Another analogy would be a privilege log, used in litigation all the time. The to, from, and date are not the contents. You may find out when somebody made a call from who it was from, who it was to. You can look at the outside of an envelope. You can see who it was from, who it was to. You can see the date. That's not reading the contents of the letter and that's not listening to the contents of the telephone conversation. Here, when you look at what Mr. Leavitt has identified as the contents, there are two things in his letter. He says Facebook user ID, that's a record, not contents. And second, a request to launch a Zynga game. That's like the fact of communication isn't contents. I mean, any privilege log, metadata, you know that there was a letter that's listed on the privilege log, just like we now know that there was a request. But there's no contents. Again, I think Judge Koh did a terrific job in describing what contents is in the iPhone app case. And she said it's what the sender intends to communicate. What Mr. Leavitt is complaining about doesn't meet that statutory definition. All right. I think we have your argument in mind. Thank you. I will give each of you two minutes on rebuttal. I have a lot of points, so I'll talk as fast as I can, Your Honor. Just a few things, just in order. Mr. Siebold did a very good job of trying to muddy up the facts here. I mean, let's talk about a few things first. Number one, when he talks about the customary operation of the internet and that it was inadvertent and that they fixed it, and that in his briefs he talks about the way it was leaked. That all bespeaks a lack of intent. If this wasn't something they were supposed to get, that they fixed it, that it was simply a leak, it was not an intended recipient of this communication. We make very clear in our complaint and the briefs that we did not intend for them to receive the communication. It was between the user and Facebook. That's number one. Number two, the point about that is publicly available, so it's not personally identifiable. Zynga tries to create a new standard that it has to be non-publicly identifiable. That's not what it is. Personally identifiable is specific things. The fact that my name is in the phone book doesn't mean that if it's not hooked up with – if Zynga takes my name, my phone number, all things that are out there, it's still personally identifiable information. Would that be true if they converted the current user to just a random number and letter sequence? If they could – which is the Facebook user – if they can use it to then unwind it and identify that user, yes it is. But that's true with regard to an EIN on a cell phone. That's true with regard to an EIN on a cell phone or a telephone number. That's how we get subscriber information with administrative support. But here what you have is a situation where the Facebook user ID is specifically linked to a person and forever it falls into – But so are those numbers. That's where I'm having a hard time following the analogy that you're trying to ask us. I'm simply saying it for the point that the fact that something is public doesn't mean that it cannot also be personally identifiable. You've used up your two minutes, and then I'm going to give Mr. Nasiri the final two. Thank you, Your Honors. Just quickly on the contract issue, I'm not aware of any binding authority that states an alleged harm must be pecuniary in order to state a claim. Here we even plausibly allege that it is. Under Twombly, I think it's more implausible to say this information is worth a gold mine to Facebook and nothing to us. And again, importantly, even if we couldn't establish pecuniary harm, we have disgorgement or nominal damages under Civil Code 3360. And then just turning to the SCA claim, again, it's important to understand our claim is a lot different from the Zynga claim, and it's much simpler. Here, the communication that's protected was the request of you stored content. And to answer your question, Judge Tallman, URLs can reveal much more content than a phone number ever could. I'll have to give you an example. If I store on my Facebook site, I have a folder that contains pictures and other information about, say, cancer treatment I received. When I want to retrieve that, I let Facebook know by clicking on the folder. What Facebook did in this case was generated, and it later fixed this, by the way, so this isn't how the Internet works, but Facebook generated a URL refer header that not only said Facebook.com, but there was a forward slash, and after that, there was Castro and Siri, and then something that said Cancer Treatment Folder. And that is what it subsequently disclosed in this case to advertisers. I thought that was the only, if you were on that page, when you clicked on the advertiser link. So if you were in your cancer folder and clicked on the advertiser link, then your Facebook ID number plus the page you were on, which in this case was the cancer treatment, would go to the advertiser. Isn't that correct? That's correct. Okay. And I'm using that to illustrate the point, because the allegations are that I don't – So I use the cancer folder because I think it illustrates kind of why these are protected communications and not like pen register phone numbers. Because whatever page I'm on, whether it's sensitive, like medical treatment, or not sensitive, it shouldn't matter under the statute. The statute doesn't require there to be some sensitivity. Okay. Thank you both. Thank you. The cases were very well argued. They are both submitted for decision, and we'll get you an answer as soon as we can. We are adjourned for the week.
judges: Alarcon, Tallman, Ikuta